Filed 3/28/22  P. v. Perkins CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>WAYNE DESHOWN PERKINS,<br><br>    Defendant and Appellant. | F081279<br><br>(Kern Super. Ct. No. BF118151A)<br><br>**OPINION** |

-ooOoo-

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth Twisselman II, Judge.

Jerome P. Wallingford, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Hill, P. J., Poochigian, J. and De Santos, J.

## INTRODUCTION

In 2010, Wayne Deshown Perkins (Perkins) and Anthony Jones (Jones) were convicted after a joint jury trial of the first degree premeditated murder of Deondre McGruder (Pen. Code, § 187, subd. (a), § 189),[1] with a gang special circumstance (§ 190.2, subd. (a)(22)).  Perkins was sentenced to life in prison without the possibility of parole.

In 2020, Perkins filed a petition for resentencing pursuant to section 1170.95, and alleged he was entitled to relief because he was not the actual killer, and his murder conviction was based on the felony-murder rule and/or the natural and probable consequences doctrine.  The superior court denied the petition.

On appeal, Perkins's appellate counsel has filed a brief which summarizes the facts with citations to the record, raises no issues, and asks this court to independently review the record.  (*People v. Wende* (1979) 25 Cal.3d 436.)  Perkins has filed a letter brief raising sentencing issues.  We affirm.

## FACTS[2]

**The Shooting**

Around 9:15 p.m. on February 13, 2007, gunshots were heard by residents of a house on Snapdragon Lane in Bakersfield.  The residents described hearing two sets of gunshots, comprised of one or two gunshots followed by a brief pause and then a number of gunshots in quick succession.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

[2] The People filed this court's opinion from the joint appeal of Perkins and Jones as an exhibit in support of its opposition to Perkins's section 1170.95 petition.  The superior court relied on this court's opinion to deny Perkins's petition, and Perkins has cited to the opinion for the factual and procedural background in his appellate brief.

Given this background, we take judicial notice of the appellate record and this court's nonpublished opinion in *People v. Perkins*, May 18, 2012, F060071, for the factual and procedural background for Perkins's conviction and sentence.  (Evid. Code, § 450, § 452, subd. (d), § 459; *In re W.R.* (2018) 22 Cal.App.5th 284, 286–287, fn. 2.)

2.

When the residents looked through their kitchen window, they saw the victim, later identified as Deondre McGruder, lying in the front yard. McGruder, who sustained multiple gunshot wounds, died from massive bleeding caused by a gunshot wound to the chest.

A criminalist examined eight spent cartridge casings found at the scene and expressed the opinion that all eight were fired from the same firearm. The firearm was a .40-caliber Glock semiautomatic pistol, either the Glock Model 22 or the Glock Model 23.[3] Police investigators also recovered one live round from the scene, but it was of a different caliber than that of the eight spent cartridge casings. Investigators found a piece of copper jacketing and a copper jacketed projectile at the scene, and another projectile was collected from the autopsy.

**Torino Jackson (Accomplice Testimony)**

Torino Jackson attributed the shooting to Perkins and Jones. Jackson testified that sometime during the afternoon on February 13, 2007, Perkins came to his house. Jones joined them later, and they all hung out together on Jackson's front porch.

After it got dark, Jackson's friend, Nyesha Hendrix, came to the house and drove Jackson, Perkins, and Jones back to her apartment. Eventually, the three men left the apartment and got into Hendrix's red, two-door Ford Escort and started driving around. Perkins was the driver, Jones sat in the front passenger's seat, and Jackson sat in the backseat. While they were driving around, Jackson was busy texting on his cell phone.

Perkins eventually stopped the car on a residential street and got out with Jones, while Jackson stayed in the car. Jackson saw them walk towards a house close to where they parked. A few minutes later, they returned to the car, and they started driving again.

Soon after they started driving again, Jackson saw McGruder walking down the street. McGruder appeared to be talking to someone in another car. Jackson testified

---

[3] The murder weapon was never found.

3.

that, as they drove by McGruder, Perkins asked him, " 'Watts up?' " McGruder replied, " 'All day, every day.' " In a prior police interview, Jackson said McGruder addressed them first, asking, " 'Watts up?' " Perkins responded by asking the same question. McGruder then said, " 'All day, every day' " and yelled, " 'South' " as their car passed by him.

Jackson testified that after this verbal exchange with McGruder, Perkins drove into a cul-de-sac and turned around. Perkins then stopped the car near where McGruder was walking and turned off the engine and lights on the car. Perkins and Jones both got out of the car, while Jackson remained in the back seat. Jones donned a ski mask, pulling it down so it covered his whole face.

Jackson saw Perkins and Jones start walking towards McGruder. He was not paying close attention, however, because he was still on his phone. Suddenly, Jackson heard gunshots and ducked down. He then peeked out and saw Perkins pointing a gun at McGruder. Jackson heard two sets of gunshots that night.

When the gunshots ended, Perkins and Jones returned to the car. As they were driving away, Jackson observed a silver gun on Jones's lap. On direct examination, Jackson testified that there was no conversation during the drive back to Hendrix's apartment, which took five to seven minutes. However, on cross-examination, Jackson testified that he remembered Jones saying that his gun had jammed.

Jackson acknowledged that he knew a person named James Beale, who had been shot and killed in February 2007. Jackson claimed he could not recall appellants discussing Beale on the drive back to Hendrix's apartment. He only recalled that they had discussed the subject earlier that day at his house, talking about how "messed up" it was that someone had killed Beale. However, during a prior police interview, Jackson said the shooting "probably was a retaliation," and reported that, during the drive back to Hendrix's apartment after the shooting, Perkins and Jones were talking about what "a cool person" Beale had been and how they had known him for a long time.

4.

Jackson testified that when they got back to Hendrix's apartment, Hendrix opened the door and Perkins and Jones went inside. Jackson claimed he stayed outside and called his sister. Eventually, two girls he knew from high school arrived at the apartment complex and gave them a ride home.

Jackson testified that the morning after the shooting, Hendrix texted him and then took him to breakfast at Denny's. After breakfast, Hendrix returned Perkins's gun to Jackson. Jackson hid the gun inside his house until Perkins came and got it from him on February 15, 2007.

**Nyesha Hendrix**

Hendrix testified that on February 13, 2007, she drove to Jackson's house around 8:00 p.m. She then drove Jackson, Perkins, and Jones back to her apartment, so she could get her wallet. When she was in her bedroom getting her wallet, Perkins came in and asked her if he could borrow her car. Hendrix was reluctant at first because Perkins had borrowed her car in the past and returned it late. She finally agreed to let him borrow the car after he promised to return it by 9:40 p.m. After Hendrix gave Perkins the keys to her car, he left the apartment together with Jones and Jackson. Hendrix did not know where they were going.

Sometime after she had gone to bed, Hendrix got a call from Jackson, asking her to open the front door to her apartment. Hendrix looked at her clock, which showed it was 9:42 p.m. Hendrix got out of bed and opened the front door. Perkins, Jones, and Jackson were standing there. According to Hendrix, all three men, including Jackson, came into the apartment, and Hendrix went back into her bedroom.

After the three men came into Hendrix's apartment, Jackson went back into the bathroom in Hendrix's bedroom, while Perkins and Jones stayed in the living room. Perkins used Hendrix's house phone to call Tasha Lelfore, whom Hendrix knew from school.

When Jackson came out of the bathroom, he sat on the edge of Hendrix's bed but did not say anything about the shooting. Eventually, Jackson left, and Hendrix stayed in her bedroom. When she was in her bedroom, one of the three men told her to come lock the front door because they were leaving. Hendrix got up, locked the door, and then went back to bed.

Hendrix woke up early the next morning and started cleaning her apartment. While she was cleaning, she found a black gun and a ski mask under the couch. Hendrix recalled that the gun had "Glock .40" printed on it. She had never seen a gun before in her house.

Hendrix placed the gun and ski mask in a backpack. She then called Jackson and asked him why there was a gun in her house. Jackson told her that Perkins had left it there.

After putting the backpack in her car, Hendrix drove to Jackson's house. Jackson came outside, took the gun and ski mask from Hendrix, and carried the items back into his house, hiding the gun under his shirt. Jackson then returned to Hendrix's car, and they went to Denny's.

Later that day, Hendrix took her car to her grandmother's house, washed it, and left it there with a tarp over it.[4]

In the past, Hendrix had heard Perkins say he was from Grape Street, which she took to mean "he was involved with the gang Grape Street."

On cross-examination, Hendrix testified it was a total surprise to her to find the gun under the couch. She did not recall any of the three men saying anything about leaving a gun when they left her apartment. However, in a prior police interview,

---

[4] A crime lab technician later processed the interior and exterior of Hendrix's car and lifted five usable prints which matched Jackson's fingerprints. All five prints were located on the exterior of the car's passenger side door and window. The crime lab technician found no usable prints matching either Perkins's or Jones's fingerprints.

Hendrix reported that, as Perkins was leaving her apartment, he asked her to take his gun to his uncle's house. Hendrix told police she did not think anything of it at the time because she was half asleep. But the next morning when she was picking things up, she saw something black sticking up from under the couch, grabbed it, and realized it was the gun Perkins had mentioned.

Hendrix also testified on cross-examination that, when she went to Denny's with Jackson the day after the shooting, Jackson told her that Jones "shot the guy twice and the gun jammed." Jackson also said something to the effect that McGruder got what he deserved because he killed Beale. Hendrix specifically recalled Jackson saying, " 'That's what he get because he shouldn't have killed James like that.' "

**Tasha and Tasia Lelfore (Witnesses of Events After Shooting)**

Sisters Tasha and Tasia Lelfore confirmed that on the evening of February 13, 2007, Perkins called to ask for a ride, and that they drove to apartments near the Wilson library and saw Jackson, Perkins, and Jones standing outside. Because there was not enough room in the car for all three men, Tasia dropped Tasha off and then returned to give Jackson and appellants a ride home. At trial, Tasia estimated that she started dropping the three men off at home around 9:00 p.m. However, she previously told a police detective it was closer to 10:00 p.m. when she started dropping them off.

Tasha testified that Perkins later called her at work and told her that she did not pick him up on February 13. She got the impression that he was trying to get her to testify that she picked him up on some other date. Tasha was certain that she and her sister picked up Perkins and Jones at the apartments on February 13, 2007, because it was her friend's birthday, and they were having a party that night. When Perkins called Tasha, he also asked for Tasia's phone number, which Tasha gave to him.

A recording of the call Perkins made to Tasha, which Perkins placed from jail, was played to the jury and admitted into evidence against Perkins only. The recording reflects that Perkins also tried to call Tasia, but his call went to her voicemail.

**Travon Stewart, Leann Newman, and Paul Evans (Witnesses of Events Prior to Shooting)**

On the night of February 13, 2007, two witnesses, Travon Stewart and Leann Newman, saw McGruder walking in a residential street near where the shooting occurred. They also both saw a red car in the vicinity. Stewart later identified Hendrix's red Ford Escort to police as the car he saw that night.

Newman specifically testified that, although they were no longer together, she had lived with McGruder for seven years and had a young child with him. Newman explained that when she saw McGruder on the night of the shooting, she was on her way to drop off their child at McGruder's mother's house to visit his father. Stewart was driving the car Newman and the child were in when she saw McGruder.

When Newman first saw McGruder, he was walking in the direction of his mother's house. The street he was walking on was near Snapdragon Lane and the street where a Foods Co. store was located. As they drove past McGruder, he looked at the car and gestured towards Newman with his hands. They kept driving and dropped the child off at McGruder's mother's house.

After dropping the child off, Newman saw McGruder again. He was still walking towards his mother's house and appeared to have just crossed back from talking to someone in a red car.

Stewart testified that when they first drove past McGruder, he appeared to be trying to flag down their car. Stewart kept driving and did not see McGruder again after they dropped off the child. As they were driving away from the house, Stewart saw Hendrix's red Ford Escort parked by a curb. Stewart saw one person in the car, sitting in the driver's seat.

Paul Evans testified that in February 2007, he lived near the Foods Co. in the neighborhood where the shooting occurred. Evans knew Perkins, Jones, and Jackson. Evans described Jackson as a close family friend. Evans was also friends with Jones and

considered himself to be a closer friend to Jones than to Jackson. Perkins, on the other hand, was "[n]ot a close friend but associate."

After the shooting, police officers came to Evans's house and informed him that Jones had been taken into custody on February 15, 2007. Evans told the police that Jones had stopped by his house a couple of days before Jones was taken into custody. Jones had stopped by twice, once in the afternoon and once in the evening.

Evans initially testified that when Jones came over to his house in the evening, it was sometime between 7:00 p.m. and 7:30 p.m. However, he later acknowledged telling police that Jones came over around 8:00 p.m. He also told police Jones could not have come over around 9:00 p.m. or 9:30 p.m. because Evans had left his house around that time.

In addition, Evans told police that, after Jones left his house that night, he too left and came back later. When Evans came back to his house, he started ironing his clothes for school. While he was ironing his clothes, a girl he knew called and told him that somebody had just gotten shot and asked him if he was okay.

Evans further testified that he saw Jackson at a McDonald's restaurant on February 21, 2007, and that Jackson asked him if he knew anyone who wanted to buy a Glock gun. Evans did not actually see the gun but could see the outline of a gun under Jackson's T-shirt. Jackson told Evans the gun "had a body on it."

The first time Evans ever told anyone about his conversation with Jackson about the gun was to a defense investigator in January 2010; Evans did not report the conversation to police investigators who questioned him about the shooting in 2007. The defense investigator, Victor Lostaunau, testified that Evans did not mention seeing the outline of a gun under Jackson's T-shirt but instead reported that he did not see the gun Jackson told him about.

9.

**Gang Evidence**

The parties stipulated that the Eastside Crips is a criminal street gang in Kern County, as the term "criminal street gang" is defined under section 186.22. Bakersfield Police Officer Ursery testified as a gang expert and opined that Perkins and Jones were active members of the Eastside Crips and that Jackson was an affiliate or associate of the gang.

Officer Ursery further opined that McGruder was affiliated with the Country Boy Crips, and testified that a longstanding rivalry existed between the East Side Crips and the Country Boy Crips. Presented with a hypothetical shooting based on the facts of this case, Ursery expressed the opinion "[t]hat it would, in fact, be in benefit of, at the direction of, and in furtherance of that particular gang."

Bakersfield Police Sergeant Jehle also testified as a gang expert and opined that Evans was an active member of the Eastside Crips gang. Jehle was of the opinion that, if an active member of the Eastside Crips criminal street gang testified in a case involving two defendants that were alleged members of the same gang, the testimony would benefit both the gang and the member that testified.

**Evidence Against Perkins Only (Dissuading a Witness Charge)**

Hendrix testified that she was arrested and charged with being an accessory to murder. Following her arraignment, she was transported in the same elevator with Perkins. She heard Perkins say she needed to be scared for her family and that "his boy T" was coming after them. Hendrix knew he was referring to a person named Terry. The elevator incident occurred shortly after Hendrix's father had called the police to report that someone was calling and making threats against Hendrix's family. Hendrix considered Perkins's comments in the elevator to be a threat, and she felt scared.

Valentina Branda, another inmate who was in the elevator with Hendrix and Perkins, testified Perkins leaned forward between Hendrix and Branda and said two

10.

times, " 'Don't trip.  The boys are coming.' "  Hendrix started crying, which led Branda to believe Hendrix was scared.

Branda further testified that she heard Perkins make the same comment (" '[t]he boys are coming' ") under his breath in the courtroom during the arraignment preceding the elevator ride.

**Perkins's Defense**

The defense presented evidence to show Jackson was the one who placed a threatening phone call received by Hendrix's father, Keith Hollins, on February 24, 2007.

Specifically, Hollins testified the phone rang around 11:00 p.m., and a male caller asked, "[I]s Nyesha there[?]"  Hollins asked who was speaking.  The caller replied, "Reno" (Jackson's moniker).  Hollins told him it was late, and that they did not get calls that late.  The caller replied that he knew she was there and that she "snitched" on his "homie."  Hollins told the caller he did not know what he was referring to.  The caller replied, " '[Y]eah, you know what's going on,' " and " 'she owe me some money.' "  Hollins further testified:  "[A]fter he said, yeah, she is there, he said, yeah, and we are going to have to pull one.  And I can hear voices in the background on the phone saying yeah, yeah, something like that.  Then he proceeded to tell me exactly where we lived."  When Hollins asked the caller how he knew where he lived, the caller said to look out the window.  Hollins did not look outside.  After hanging up the phone, Hollins directed his family members to lie down on the floor and dialed 911.

Bakersfield Police Officer Drewry responded to Hollins's residence 15 to 20 minutes later.  Drewry testified that Hollins told him that Jackson, whose voice he recognized, had called and requested to speak with Hendrix.  When Hollins refused, Jackson began to threaten Hollins, saying he was going to shoot Hendrix for speaking with the police regarding their investigation and that he was going to kill all the family members.

11.

When speaking with Officer Drewry, Hollins referred to Jackson by his first name (Torino) and said he knew Jackson and that Jackson had come to his residence on a number of occasions with Hendrix. Hollins did not mention hearing other voices in the background or Jackson saying anything about "homies" during the phone call.

Officer Drewry also spoke with Hendrix, who told him that she thought Jackson was involved in the murder on Snapdragon Lane and believed that Jackson thought she was speaking with police regarding their investigation of the murder. Hollins and Hendrix both sounded like they were being truthful.

The defense also presented evidence that Hendrix initially reported to police that Jackson borrowed her car on the night of the shooting. Bakersfield Police Detective West testified he interviewed Hendrix on February 25, 2007. During the interview, she said she picked up Jackson at his house and drove him back to her apartment. She also said she loaned her car to Jackson. She said she gave him the keys, and he left driving the car. Initially, she said Jackson borrowed her car around 9:20 p.m. (the reporting time of the Snapdragon homicide was around 9:24 p.m.). However, in a later interview, Hendrix said he actually borrowed her car around 9:00 p.m., and she had lied in her first interview because she was scared.

Detective West also interviewed Jackson on February 25, 2007. Jackson initially reported that Hendrix stopped by his house but claimed he did not leave with her and was at his house the whole day. Later, Jackson admitted he went to Hendrix's apartment and said he went to get money for shoes. Jackson reported that when he went inside her apartment, Perkins came out of the bedroom and then he and Perkins both left.

Jackson initially denied taking possession of a gun from Hendrix. Eventually, he admitted he received a gun from Hendrix and put it under his couch.

Detective West also testified that the distance between Hendrix's apartment complex, which was located on Freemont Street off of Wilson and South H Streets, and the address on Snapdragon Lane where the shooting occurred, was about a mile and a

half, and was a three- to 15-minute drive, depending on traffic. There was a mixture of residential and commercial areas between Hendrix's residence and the Snapdragon Lane location. The distance between Jackson's residence on Monitor Street and the Snapdragon Lane location was roughly two miles.

## PROCEDURAL BACKGROUND

On March 15, 2010, after a joint jury trial, Perkins and Jones were convicted of count 1, first degree premeditated murder of McGruder (§ 187, subd. (a), § 189), with the special circumstance that the murder was intentional and committed while each defendant was an active participant in a criminal street gang and to further the gang's activities (§ 190.2, subd. (a)(22)); and the jury also found the gang enhancement true (§ 186.22, subd. (b)(1)).[5]

As to Perkins, the jury found true two firearm enhancements alleged as to count 1:

(1) Perkins personally and intentionally discharged a firearm causing death, pursuant to section 12022.53, subdivision (d); and

(2) Perkins was a principal who committed the offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), and that he or another principal personally and intentionally discharged a firearm causing death, pursuant to section 12022.53, subdivisions (d) and (e)(1).

The jury made the identical findings on the same two firearm enhancements alleged as to count 1 for Jones.

Perkins was separately convicted of being felon in possession of a firearm and willfully attempting to dissuade a witness with a gang enhancement. The court dismissed the prior prison term enhancements alleged as to Perkins.

---

[5] Perkins and Jones were initially tried in 2008, but a mistrial was declared, and they were retried together in 2010.

13.

**Sentencing**

On April 13, 2010, the court held the sentencing hearing and addressed the parties' motions for new trial. The court stated that when the verdicts were returned, the parties discussed whether it was inconsistent for the jury to find true the section 12022.53, subdivision (d) enhancement as to both Perkins and Jones, that each defendant personally discharged a firearm causing death. The court questioned whether substantial evidence supported that enhancement for both defendants.

The court gave a tentative ruling that it would strike the "personal discharge" enhancement as to both defendants based on inconsistent findings and insufficient evidence "that each of them personally discharged a firearm" within the meaning of section 12022.53, subdivision (d). The court stated that would "still leave" the second enhancement under section 12022.53, subdivisions (d) and (e)(1), that each defendant was a principal who committed the offense for the benefit a criminal street gang, and that he or another principal personally and intentionally discharged a firearm causing death, "and that finding does not require the defendant to have personally discharged a firearm."

The prosecutor objected and argued there was substantial evidence that Perkins fired the gun, and the personal discharge enhancement should only be modified as to Jones.

The court responded:

"[T]he Court finds that the verdict of the jury with regard to the findings under … Section 12022.53, Subdivision (d) with regard to the defendant personally discharging a firearm, that there is not substantial evidence to support that as to Defendant Jones. And that by returning the verdict that the Defendant Jones personally discharged the firearm, that is inconsistent with their finding that Defendant Perkins discharged the firearm. [¶] This Court does have the discretion and the power to strike such enhancements. … So based on the finding of inconsistent verdicts and based on the finding of insufficiency of the evidence, I do find it's in the interest of justice to strike the enhancements in Count 1 as to both the defendants. And those are the enhancements under … Section 12022.53 Subdivision (d) only."

14.

Perkins's attorney did not object to the court's ruling.

Thereafter, the court sentenced both Perkins and Jones to life in prison without the possibility of parole for count 1, first degree premeditated murder with the gang special circumstance; and stayed the terms of 25 years for the firearm enhancement under section 12022.53, subdivisions (d) and (e)(1), and 15 years for the section 186.22, subdivision (b)(1) gang enhancement. Perkins was also sentenced to a consecutive term of seven years to life for willfully attempting to dissuade a witness with the gang enhancement, and the court stayed the sentence imposed for felon in possession of a firearm.

**Defendants' First Appeal**

On May 18, 2012, this court filed the opinion in the joint appeal from Perkins and Jones. As to Perkins, this court rejected his arguments and affirmed his convictions and sentence. We agreed with Jones's argument that his sentence of life without parole must be vacated and the matter remanded for resentencing because the court was unaware of its discretion to impose a term of 25 years to life, and otherwise affirmed his conviction.[6]

**SENATE BILL Nos. 1437 & 775**

The instant appeal is from the denial of Perkins's petition for resentencing that he filed pursuant to Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), that was effective on January 1, 2019, and amended " 'the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person *who is not the actual killer*, *did not act with the intent*

---

[6] On October 31, 2012, the court held the resentencing hearing on remand for Jones. The court noted Jones was 17 years old at the time of the offense and sentenced him to 25 years to life for count 1, first degree murder, plus 25 years to life for the firearm enhancement, for an aggregate term of 50 years to life. Jones filed an appeal from the court's sentencing decision on remand. We affirmed the sentence but found the abstract of judgment had to be corrected to reflect that restitution was ordered to be joint and several with Perkins. (*People v. Jones*, May 28, 2014, F066161 [nonpub. opn.].)

*to kill*, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*People v. Lewis* (2021) 11 Cal.5th 952, 959, italics added (*Lewis*).)

"Substantively, Senate Bill 1437 accomplishes this by amending section 188, which defines malice, and section 189, which defines the degrees of murder, and as now amended, addresses felony murder liability." (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723; *People v. Gentile* (2020) 10 Cal.5th 830, 842.)

"In addition to substantively amending sections 188 and 189 of the Penal Code, Senate Bill 1437 added section 1170.95, which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*Lewis, supra*, 11 Cal.5th at p. 959.)

"Pursuant to section 1170.95, an offender must file a petition in the sentencing court averring that: '(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;] [¶] [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to section 188 or 189 made effective January 1, 2019.' [Citations.] Additionally, the petition shall state '[w]hether the petitioner requests the appointment of counsel.' [Citation.] If a petition fails to comply with subdivision (b)(1), 'the court may deny the petition without prejudice to the filing of another petition.' " (*Lewis, supra*, 11 Cal.5th at pp. 959–960.)

"Where the petition complies with [section 1170.95,] subdivision (b)'s three requirements, then the court proceeds to subdivision (c) to assess whether the petitioner has made 'a prima facie showing' for relief. [Citation.] [¶] If the trial court determines that a prima facie showing for relief has been made, the trial court issues an order to show

cause, and then must hold a hearing 'to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not … previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence.' [Citation.] 'The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.' [Citation.] At the hearing stage, 'the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' " (*Lewis, supra*, 11 Cal.5th at p. 960.)

**Lewis**

In *Lewis*, the court interpreted the provisions of section 1170.95 and held that petitioners "are entitled to the appointment of counsel upon the filing of a facially sufficient petition [citation] and that only *after* the appointment of counsel and the opportunity for briefing may the superior court consider the record of conviction to determine whether 'the petitioner makes a prima facie showing that he or she is entitled to relief.' [Citation.]" (*Lewis, supra*, 11 Cal.5th at p. 957, italics added in original.) *Lewis* held the language of section 1170.95, subdivision (c) "is mandatory: 'If the petitioner has requested counsel, the court *shall* appoint counsel to represent the petitioner.' " (*Lewis,* p. 963, italics added in original.) The court's failure to appoint counsel only constitutes state error subject to review under *People v. Watson* (1956) 46 Cal.2d 818. (*Lewis,* at p. 973.)

*Lewis* also held that "at the prima facie stage, a petitioner's allegations should be accepted as true, and the court should not make credibility determinations or engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Lewis, supra,* 11 Cal.5th at p. 974.) When the court conducts the prima facie determination, section 1170.95, subdivision (b)(2) only permits screening out "noncomplying petitions, not petitions that lack substantive merit." (*Lewis,* at p. 968.)

17.

*Lewis* further held that after appointing counsel, the trial court could rely on the record of conviction to determine whether the prima facie showing is made "to distinguish petitions with potential merit from those that are clearly meritless." (*Lewis, supra*, 11 Cal.5th at p. 971.) The record of conviction includes a prior appellate opinion, although it will be case-specific. (*Id.* at p. 972.)

The prima facie finding under section 1170.95, subdivision (c) is limited, and the court must accept the petitioner's factual allegations as true and cannot reject the allegations on credibility grounds without conducting an evidentiary hearing. (*Lewis, supra*, 11 Cal.5th at p. 971.) " 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Ibid.*) "In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' [Citation.] [T]he 'prima facie bar was intentionally and correctly set very low.' " (*Lewis,* at p. 972.)

**Senate Bill No. 775**

In October 2021, Senate Bill No. 775 was enacted and amended section 1170.95, effective on January 1, 2022. (2020–2021 Reg. Sess.; Stats. 2021, ch. 551, § 1) (Senate Bill 775).) As a result of the amendments, section 1170.95 clarified that "persons convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter," may file a petition to have that conviction vacated under certain circumstances. (§ 1170.95, subd. (a).)

The amendments also codified the holding in *Lewis* that a petitioner has the right to appointment of counsel, if requested, prior to the court making the prima facie finding: "Upon receiving a petition in which the information required by this subdivision is set

forth …, if the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner." (§ 1170.95, subd. (b)(3).) After appointment of counsel, the parties shall have the opportunity to submit briefing, and "the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief." (*Id.*, at subd. (c).)

If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause. If the court declines to make an order to show cause, it shall provide a statement fully setting forth its reasons for doing so. (§ 1170.95, subd. (c).) If the court issues the order to show cause and conducts a hearing, the prosecution has the burden to prove beyond a reasonable doubt that petitioner is guilty of murder or attempted murder under the amended versions of sections 188 and 189. (*Id.*, at subd. (d)(3).)

"The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens. A finding that there is substantial evidence to support a conviction for murder … is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3), as amended by Stats. 2021, ch. 551, § 2, eff. Jan. 1, 2022.)

## PERKINS'S SECTION 1170.95 PETITION

On December 18, 2019, Perkins filed a petition in the superior court for resentencing of his life term pursuant to section 1170.95 and requested appointment of counsel.

The petition was supported by Perkins's declaration, signed under penalty of perjury, where he checked boxes on a preprinted form that he was entitled to resentencing under section 1170.95 because a complaint or information was filed against him that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine; at trial, he was convicted of first or second degree pursuant to the felony-murder rule or the natural and probable consequences doctrine; and he could not now be convicted of first or second degree murder under the amended versions to sections 188 and 189.

Perkins further declared he was not the actual killer; he did not, with the intent to kill, aid, abet, counsel, command, induce, solicit or assist the actual killer in the commission of first degree murder; and there was no prior determination by the court or jury that he was a major participant or acted with reckless indifference to human life.

On December 27, 2019, the court appointed the public defender to represent Perkins.

**The Prosecution's Opposition**

On February 5, 2020, the People filed opposition, with this court's nonpublished opinion from Perkins's first appeal as a supporting exhibit.

The People argued Perkins was not eligible for relief under section 1170.95 because he was not prosecuted under the felony-murder rule or the natural and probable consequences doctrine, and no underlying crime or unlawful act was alleged or argued. Instead, Perkins was tried and convicted based on premeditated murder and actual malice. In addition, the jury found true the gang special circumstance, that whether or not he was the actual killer, he acted with the intent to kill (§ 190.2, subd. (a)(22)).

20.

**Perkins's Reply**

On March 11, 2020, the superior court directed Perkins to file a reply.

On May 19, 2020, the public defender, on behalf of Perkins, filed a reply, did not object to the People's filing and reliance on the prior appellate opinion, and submitted the matter based on Perkins's petition where he denied being the actual killer.

**The Court's Denial of the Petition**

On June 1, 2020, the superior court issued an order that denied Perkins's petition:

> "The court has conducted its own review of the court's file, including the opinion of the Fifth District Court of Appeal filed on 05/18/2012. Defendant Perkins was convicted of first degree murder and this conviction was not based on the felony-murder rule or the natural and probable consequences doctrine. [¶] The jury also found true the gang special circumstance under … section 190.2(a)(22). The language of the special circumstance tracks the language of Senate Bill 1437 and the new felony-murder statutes. As a matter of law, defendant Perkins has failed to establish a prima facie case of eligibility for resentencing, and the petition is denied."

On June 5, 2020, Perkins filed a timely notice of appeal of the court's order of June 1, 2020.

## DISCUSSION

As noted above, Perkins's counsel has filed a *Wende* brief with this court. The brief also includes the declaration of appellate counsel indicating that Perkins was advised he could file his own brief with this court. By letter on December 10, 2020, we invited him to submit additional briefing.

**Perkins's Letter Brief**

On December 29, 2020, Perkins filed a letter brief in the instant *Wende* appeal, and stated the court abused its discretion when the court "took it in his hands" to strike the section 12022.53, subdivision (d) personal discharge enhancement at the sentencing hearing, it improperly "removed an element" and denied him "the opportunity to have the issue reviewed on direct appeal," and he had been serving an illegal sentence as a result.

21.

Perkins's argument is based on the court's decision at the sentencing hearing in 2010, when it ordered the personal discharge enhancement pursuant to 12022.53, subdivision (d) stricken as to count 1, murder, for both Perkins and Jones, because of inconsistent verdicts and insufficient evidence. Perkins did not object to the court's order, and he did not raise this issue in his direct appeal and has forfeited further review. (See, e.g., *In re Reno* (2012) 55 Cal.4th 428, 486.)

Moreover, the court's decision to strike the personal discharge enhancement did not invalidate Perkins's murder conviction or life sentence based on the nature of the jury's verdicts and findings. As to both Perkins and Jones, there were two separate section 12022.53, subdivision (d) enhancements alleged and found true as to count 1, first degree premeditated murder. The first enhancement alleged that each defendant personally discharged a firearm causing death, within the meaning of section 12022.53, subdivision (d); the court ordered this enhancement stricken. The second enhancement alleged that each defendant was a principal in the murder, and that at least one principal personally used a firearm, within the meaning of section 12022.53, subdivisions (d) and (e)(1); the court imposed and stayed the term for this enhancement.

The court's decision to strike the first subdivision (d) enhancement did not invalidate the second subdivision (d) enhancement or invalidate Perkins's conviction for first degree premeditated murder and the sentence imposed in this case. Perkins was a principal in the murder, he violated section 186.22, subdivision (b), and a co-principal in the offense personally and intentionally discharged a firearm causing McGruder's death.

As for his section 1170.95 petition, such a petition is properly denied if the jury made a true finding on a special circumstance that renders the defendant ineligible for relief. (*People v. Fayed* (2020) 9 Cal.5th 147, 201–202; *People v. Nunez* (2020) 57 Cal.App.5th 78, 90–91; *People v. Allison* (2020) 55 Cal.App.5th 449, 457–458.) Section 189, subdivision (e), as amended, states in relevant part that a person is liable for murder if the actual killer; or the person was not the actual killer but, with the intent to kill, aided,

22.

abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.

The superior court properly found Perkins was not eligible for resentencing under section 1170.95. The jury was instructed on first and second degree murder, malice, and premeditation, and direct aiding and abetting. The jury was not instructed on the felony-murder rule, the natural and probable consequences theory, or any underlying felonies.

The jury found true the gang special circumstance under section 190.2, subdivision (a)(22) – that "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang … and the murder was carried out to further the activities of the criminal street gang." The jury was instructed with CALJIC No. 8.80.1, which stated in relevant part: "Unless an intent to kill is an element of the special circumstance, if you are satisfied beyond a reasonable doubt that the defendant actually killed a human being, you need not find that the defendant intended to kill in order to find the special circumstance to be true. [¶] *If you find that a defendant was not the actual killer of a human being, or are unable to decide whether the defendant was the actual killer or an aider and abettor*, you cannot find the special circumstance to be true as to that defendant unless you are satisfied beyond a reasonable doubt that such defendant *with the intent to kill* aided and abetted any actor in the commission of murder in the first degree." (Italics added.) The jury was also instructed pursuant to CALJIC No. 8.81.22, in relevant part, that as to count 1, murder, "[t]o find the special circumstance 'intentional killing by an active street gang member' is true, it must be proved" that the defendant "*intentionally* killed the victim," and "[t]he defendant, whether or not the actual killer, *acted with the intent to kill*." (Italics added.)

The trial court's instructions in this case only allowed the jury to find Perkins guilty of first degree premeditated murder based on his own premeditation, deliberation, and intent to kill. The jury's true finding on the gang special circumstance required a finding that Perkins acted with the intent to kill. The jury did not find Perkins was an

aider and abettor under the natural and probable consequences doctrine or the felony-murder rule. Thus, Perkins is ineligible for relief under section 1170.95 as a matter of law.[7]

After independent review of the record, we find that no reasonably arguable factual or legal issues exist.

## DISPOSITION

The judgment is affirmed.

---

[7] We note that in *People v. Pacheco* (March 9, 2022) __ Cal.App.5th __ [2022 Cal.App.LEXIS 192], Division 3 of the Fourth District held the defendant's section 1170.95 petition should not have been summarily denied and remanded the matter for an evidentiary hearing. The defendant was convicted of first degree murder as an aider and abettor, and the gang special circumstance was found true. *Pacheco* held the special circumstance did not automatically make the defendant ineligible for relief under section 1170.95 because the jury in that case was instructed on the natural and probable consequences theory. While the instruction for the gang special circumstance stated the jury had to find he had the intent to kill, the jury was not instructed to find the defendant directly aided and abetted the target crime of murder. "Therefore, without weighing the evidence, the jury's true finding on the gang special circumstance does not conclusively establish [the defendant] could be found guilty of murder under the current law (that he had the intent to kill, and he directly aided and abetted the target crime of murder.)" In contrast to *Pacheco*, the jury in this case was not instructed on the natural and probable consequences doctrine and was only instructed on direct aiding and abetting.